UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
EBENEZER OPUKO ACHEAMPONG,

        Plaintiff,

    -v-                              No.  11CV9205-LTS-SN

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION et al.,

        Defendants.
-------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

        Plaintiff Ebenezer Opuko Acheampong ("Plaintiff") brings this action against his

former employer, the New York City Health and Hospitals Corporation ("HHC"),

Generations+/Northern Manhattan Network, Harlem Hospital Center ("Harlem Hospital" or the

"Hospital"), Dr. John Palmer ("Dr. Palmer"), Yvonne Reynolds ("Reynolds"), Laureen

Goodridge-Smith ("Goodridge-Smith") and Herman Smith ("Smith" and collectively,

"Defendants"),[1] alleging that he was discriminated against, retaliated against and subjected to a

hostile work environment[2] on the basis of his disability, age, national origin, race and skin color

in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.; the

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq.; Title VI of the

---

[1]    The Complaint also names as defendants Clay Omowale, who was never served, and the City of New York.  In his opposition papers to the instant motion practice, Plaintiff withdraws his claims against both.  (See Pl. Opp. at pp. 1, 32.)

[2]    Plaintiff does not specifically articulate claims for retaliation or hostile work environment as enumerated causes of action in his Amended Complaint, but as the factual allegations in the Amended Complaint and the parties' briefing on this motion assume that Plaintiff raises such claims, the Court also treats Plaintiff as having raised them.

Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq.; Title VII of the Civil Rights Act of 1964,

42 U.S.C. §§ 2000e et seq.; 42 U.S.C. § 1983 ("Section 1983"); and the New York State Human

Rights law, N.Y. Exec. Law §§ 296 et seq. ("NYSHRL").[3]  Plaintiff asserts that Defendants

discriminated against him by, inter alia, failing to promote him, suspending him and, eventually,

terminating his employment.

 Defendants have moved for summary judgment, arguing that many of Plaintiffs'

claims are time-barred or procedurally barred and, as to the remainder, that Defendants are

entitled as a matter of law to judgment in their favor.  The Court has jurisdiction of this action

pursuant to 28 U.S.C. §§ 1331 and 1367.  For the following reasons, Defendants' motion for

summary judgment is granted in its entirety.


BACKGROUND[4]

 From September 8, 2003, to 2011, Plaintiff, a black Ghanaian immigrant who is

at least sixty-four years of age, was employed as a Level I Computer Aide by HHC at Harlem

Hospital.  (Def. 56.1 St. ¶¶ 1, 5, 7; Pl. 56.1 Counter St. ¶ 1.)  Approximately one year before he

began working at HHC, Plaintiff was hit on the head with a baseball bat and lost hearing in both

---

[3]     Plaintiff also asserts a claim of "harassment" under the "New York State Civil Rights
Law," but as there is no such tort of "harassment" and Plaintiff does not explain
himself in his opposition, the Court adopts the Defendants' analysis and construes the
"harassment" cause of action as a hostile work environment claim under the
NYSHRL.

[4]     Facts recited as undisputed are identified as such in the parties' statements pursuant to
S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no
non-conclusory contrary factual proffer.  Citations to the parties' respective Local
Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference
the parties' citations to underlying evidentiary submissions.  Plaintiff's Counter
Statement of Facts is referred to using the citation "Pl. 56.1 Counter St."

ears as a result.  (Pl. 56. 1 St. ¶ 6.)  In 2003, Plaintiff was using a hearing aid in his right ear; by 2004 or 2005, Plaintiff had to use hearing aids for both ears.  (Def. 56.1 St. ¶¶ 8-9.)  HHC knew from the commencement of Plaintiff's employment that he had a hearing disability.  (Pl. 56.1 Counter St. ¶ 13.)

Plaintiff was assigned to the Nursing Information Service ("NIS") at Harlem Hospital, where he used a special telephone to aid his hearing.  (Def. 56.1 St. ¶¶ 10-11.) According to Plaintiff, his primary functions at the NIS were to input overtime data from authorization sheets and schedules from plan sheets; make changes to schedules; prepare and print the payroll report; and import data.  (Pl. 56.1 St. ¶ 102.)  In 2004, Defendant Reynolds, an African-American woman, became Plaintiff's immediate supervisor.  (Def. 56.1 St. ¶¶ 12-13.) Defendant Goodridge-Smith, also an African American woman, was the Associate Executive Director of Nursing and Defendant Reynolds' supervisor.  (Id. ¶¶ 14-15.)  In 2004, 2005, 2006, and 2008, Plaintiff received overall ratings of "satisfactory" on his performance evaluations.  (Id. ¶¶ 16-17, 19.)

Facts Relating to Plaintiff's Failure to Promote Claim

In February 2004, HHC employees were permitted to take a promotion examination.  Their score on this examination was considered in combination with other factors, including experience and education.  (Def. 56.1 St. ¶¶ 72, 73.)  Plaintiff took the exam and received a score of 75 out of 100, which ranked him as number 10 on the list of employees eligible for promotion, with number 1 as the top-ranked person.  (Id. ¶¶ 75-76.)  According to Plaintiff, there was also a policy at the HHC, and at Harlem Hospital, whereby a supervisor could make a request to promote a candidate for a position or request that an internal candidate

be promoted within a department.  (Pl. 56.1 Counter St. ¶¶ 23-24.)  Plaintiff alleges that he gave

his paperwork to his immediate supervisor, Defendant Reynolds, so that she would obtain the

approvals necessary for his promotion.  (Pl. 56.1 Counter St. ¶ 25.)  On June 21, 2005,  Plaintiff

attended a hiring pool and was interviewed by three HHC hospitals with potential vacancies

available for a position at a higher level than the one Plaintiff held.  (Def. 56.1 St. ¶¶ 78-80.)

Plaintiff alleges that, while interviewing, he was told that his department head had not sent the

requisite certification documents, which meant that Plaintiff could not be certified for the

positions for which he was interviewing.  (Pl. 56.1 Counter St. ¶ 33.)  However, Defendants

contend that, at the hiring pool stage, an applicant's current supervisor does not submit any

paperwork.  (Def. 56.1 St. ¶¶ 81-82.)

   Plaintiff was not selected for any of the positions for which he interviewed in

June 2005, and does not know who was selected.  (Id. ¶¶ 83-84.)  After he was interviewed again

in March 2006, he again was not selected, and does not know anyone who was selected.  (Id. ¶¶

87-89.)  According to Plaintiff, after the 2006 interviews, Plaintiff returned to Defendant

Reynolds to request a letter from Defendant Goodridge-Smith that would certify him for

promotion, and Defendant Reynolds told Plaintiff that Defendant Goodridge-Smith had said that

he should not be promoted because he could not hear.  (Pl. 56.1 Counter St. ¶¶ 42-44.)

Defendant Reynolds also allegedly told Plaintiff to speak to Herman Smith and Clay Omowale,

both of whom worked for HHC's Human Resources department, but, although Plaintiff tried to

meet with Smith, he was unable to do so.  (Id. ¶¶ 45-47.)

   Plaintiff was notified that there would be a third hiring pool conducted in March

2007, again based on the eligibility list from the 2004 examination.  (Def. 56.1 St. ¶ 90.)  Before

the hiring pool, Plaintiff met with Omowale, who allegedly told him that someone from Harlem

Hospital would attend the interviews, which Plaintiff understood to mean that there would be someone there who could certify him for promotion.  (Pl. 56.1 Counter St. ¶¶ 53-54.)  Plaintiff attended the 2007 hiring pool, but was not certified or promoted.  (Pl. 56.1 Counter St. ¶¶ 55-58, Def. 56.1 St. ¶¶ 90-91.)

According to Defendants, Plaintiff's name was not considered further because, after the 2007 interview, Plaintiff voluntarily declined to be considered further by deliberately checking a box on the Notice of Interview form and withdrawing his candidacy.  (Def. 56.1 St. ¶¶ 92-93.)  Plaintiff contends that he did not decline to be considered for the 2007 openings and wanted his name kept on the list.  (Pl. 56.1 St. ¶¶ 92-93.)  Plaintiff later requested that his name be restored to the list and was notified that his request had been approved and his name restored on May 9, 2007.  (Def. 56.1 St. ¶ 95.)  According to Defendants, no appointments to the position of computer associate (operations), the position for which Plaintiff was applying, were made at Harlem Hospital – based on the examination that Plaintiff had taken – before the eligibility list expired on January 12, 2009.  (Id. ¶¶ 96-99.)

Facts Relating to Plaintiff's Retaliation Claim

Plaintiff alleges that he complained informally to Omowale in 2006 that he was not being promoted because he had a hearing disability.  According to Plaintiff, Omowale said that Plaintiff should not worry and that he would speak with Defendant Goodridge-Smith.  Plaintiff alleges that he heard nothing back from Omowale.  (Pl. 56.1 Counter St. ¶¶ 59-62.)  After Defendant Goodridge-Smith refused to write Plaintiff a letter to support his promotion in 2007, Plaintiff went to Defendant Dr. Palmer to lodge a discrimination complaint.  (Pl. 56.1 Id. ¶ 82.)  According to Plaintiff, he told Dr. Palmer's secretary in September 2008 that his pay was

being inappropriately docked; that garbage was being left under his desk; that Defendant

Goodridge-Smith was refusing to support his promotion; and that Defendant Reynolds

sometimes called a second person in to witness instructions being given to him because she said

that Plaintiff could not hear.  (Pl. 56.1 Counter St. ¶ 83.)[5]  According to Plaintiff, Dr. Palmer

instructed him in October 2008 to go to Human Resources and, when he went, Defendant

Goodridge-Smith was there with Omowale.  (Id. ¶ 86.)  Omowale told him that he would

schedule a meeting with Plaintiff and Plaintiff's union representative.  (Id.)   Plaintiff contends

that no subsequent meeting took place and that, although he tried to meet with Defendant Dr.

Palmer on two more occasions, he was not given an appointment and never heard anything

further.  (Id. ¶¶ 87-89.)

   Plaintiff contends that, after he complained to Defendant Dr. Palmer, the

"Defendants ratcheted up their discriminatory acts against him."  (Id. ¶ 90.)  Plaintiff states in a

Declaration that one of his co-workers informed him that Defendants were trying to get rid of

him and that the Assistant Director of Nursing told him that "his treatment by his supervisor and

his peers was being done at the behest of Defendant Goodridge-Smith, his Department head."

(Id. ¶¶ 91-93.)  According to Plaintiff, he was frequently derided and mocked because of his

hearing problems during this time period.  (Id. ¶ 92.)  Defendants point out that Plaintiff

testified, however, that Defendant Goodridge-Smith never made any comments to Plaintiff

directly about his hearing and that he could not recall whether Defendant Reynolds or Defendant

Goodridge-Smith ever made comments to him about his age, race or ethnicity.  (See Def. 56.1

St. ¶¶ 25-26; Pl. 56.1 St. ¶ 25.)  Defendant Reynolds testified that Plaintiff never complained to

---

[5]   Plaintiff testified that, on three or four occasions, Defendant Reynolds made
comments to him about his hearing and asked another employee, Baez Shontisa, to
be present when she spoke to Plaintiff. (Pl. 56.1 St. ¶ 23.)

her about discrimination; and Defendant Goodridge-Smith testified that Plaintiff once complained to her because he thought that two female staff members were laughing at him, but when she spoke to the staff members, she concluded that they were not. (Def. 56.1 St. ¶ 106.)

Plaintiff further contends that, after he had complained about not being promoted and about being treated differently, around mid to late 2008, Plaintiff began to notice that his pay was being docked. (Pl. 56.1 Counter St. ¶ 67.) According to Plaintiff, he had always had his completed time sheets signed by Defendant Reynolds, who also gave him copies so that he could track his own vacation and sick time leave and so that he did not have to request and obtain approval to take such leave. (Pl. 56.1 Counter St. ¶¶ 68-71.) Plaintiff alleges that, at some point in late 2008, Defendant Reynolds stopped signing Plaintiff's time sheets and delegated this function to Defendant Goodridge-Smith's secretary, who made changes to Plaintiff's time sheets, of which Plaintiff was not given copies so that he could track his time. (Id. ¶¶ 73-78.) According to Plaintiff, Defendant Reynolds also initially refused to approve Plaintiff taking off time to attend his mother's funeral in Ghana around this time, and Plaintiff contends that, after he returned from his mother's funeral, he learned that he no longer had direct deposit for his paychecks. (Pl. 56.1 Counter St. ¶¶ 103-106.) When Plaintiff inquired as to what had happened with his direct deposit, he was told by a payroll employee that he had been removed from the system because Defendant Reynolds was trying to fire him, but he was later placed back in the system after he spoke with the Human Resources labor relations liaison. (Id. ¶¶ 110, 112.)

Plaintiff's Suspension and Termination

Plaintiff contends that, on or about February 17, 2009, Defendant Reynolds docked time from him when he had not actually taken any time off and that, when he asked her

about it, she said it was because he had taken the time.  (Pl. 56.1 Counter St. ¶¶ 113-115.)

According to Plaintiff, he then asked Defendant Reynolds for his time sheet so that he could

calculate his own time and asked why she had not given him copies of his time sheets as he had

requested, but she ignored his questions and told him that he could not speak to her.  (Pl. 56.1

Counter St. ¶¶ 116-118.)  Plaintiff contends that he became very emotional and began to cry, and

Defendant Reynolds picked up the phone and called hospital security.  (Id. ¶¶ 119-122.)

According to Defendants, Defendant Reynolds called hospital security because Plaintiff was

screaming at her, had thrown papers on her desk and, as she stated in the disciplinary charges

subsequently served on Plaintiff, she felt that her safety and the safety of her coworkers was at

risk.  (Def. 56.1 St. ¶¶ 28-29; Declaration of John S. Schowengerdt ("Schowengerdt Dec.") Ex.

C, March, 2009 Disciplinary Charges at D00304.)  Plaintiff denies that he threatened Defendant

Reynolds.  (Pl. 56.1 Counter St. ¶ 122.)  However, four staff members submitted statements

describing the incident in support of the disciplinary charges, which confirmed Defendant

Reynolds' description of the events.  (Def. 56.1 St. ¶¶ 31-32; Schowengerdt Dec., Ex. D.)

Harlem Hospital's police were sent to Plaintiff's office, and escorted him to the hospital labor

relations office, where he was informed that he was being relieved of his duties pending an

investigation into the allegations regarding his behavior and was asked to return all hospital

property.  (Def. 56.1 St. ¶¶ 33-34, Pl. 56.1 Counter St. ¶¶ 123-124.)

        On March 11, 2009, Plaintiff was served with formal disciplinary charges, which

charged him with engaging in misconduct on February 17, 2009.  (Def. 56.1 St. ¶ 36.)  On March

19, 2009, through his union representative, Plaintiff executed a settlement agreement with HHC

and accepted a penalty of a thirty-day suspension without pay.  (Def. 56.1 St. ¶¶ 37-38.)

According to Plaintiff, his union representative told him that, if he did not sign the thirty-day

suspension agreement, he would be terminated.  (Pl. 56.1 Counter St. ¶ 127.)  Plaintiff contends

that, when he returned from his suspension, Defendant Reynolds changed his performance

review from the overall rating of "satisfactory" for the review period of September 8, 2007, to

September 7, 2008, to "less than satisfactory" even though his favorable review had been signed

by all relevant parties several months before.[6]  (Pl. 56.1 Counter St. ¶¶ 129-133.)  Defendant

Reynolds testified that Plaintiff received an unsatisfactory rating because there were many errors

in his work, which had to be revised by others, in the 2008-09 period.  (Def. 56.1 St. ¶ 21.)

From April 2009 onward, Plaintiff asserts, his job functions were restricted and he

was only allowed to enter nursing schedules and not do anything with new employee data,

overtime or various reports, and that he was not trained in the new computer system that the

Hospital was using.  (Pl. 56.1 Counter St. ¶¶ 134-136, 138-140.)  On April 24, 2009, Plaintiff

states, he went to Human Resources to report the harassment that he was experiencing, but

instead of investigating his complaint, Human Resources advised him to speak to a union

representative.  (Id. ¶ 137.)

On August 5, 2009, Defendant Reynolds reported to the Hospital police that, the

day before, Plaintiff had approached her from behind when they were alone in a hallway in the

Hospital and, following her closely, had stated "I am going to kill you.  I know more about you

---

[6]     To the extent Plaintiff contends that Defendant Reynolds retroactively changed his
performance rating for the period ending in September 2008, this appears inconsistent
with the documentary evidence.  Defendants' Exhibit AA contains an evaluation for
that period, for which Plaintiff received a "satisfactory" rating.  In her deposition
testimony, Defendant Reynolds spoke of Plaintiffs' problematic job performance
during the 2008-09 period (See Schowengerdt Dec., Ex. I, Reynolds Tr. at 155:16-
19), and Defendants have submitted an evaluation for that period, for which Plaintiff
received a "below standard" rating.  There is no evidence demonstrating that
Plaintiff's satisfactory rating for the period ending in September 2008 was altered and
any statements to that effect contained in his Declaration (Declaration of Wendy
Pelle-Beer ("Pelle-Beer Dec."), Ex. U ¶¶ 50-51) are inconsistent with the evidence.

than you think.  I know what you are doing," and that she had "felt afraid, threatened and

violated" because of Plaintiff's remarks and "was trembling like a leaf."  (Def. 56.1 St. ¶¶ 39-

40.)  Defendant Reynolds did not immediately report the incident to her supervisor, Defendant

Goodridge-Smith, and she never filed a complaint with the New York Police Department or

District Attorney's Office.  (Pl. 56.1 Counter St. ¶¶ 143-144.)  That same day (August 5, 2009),

Plaintiff was relieved of his duties pending an investigation into the events of August 4, 2009,

and on August 24, 2009, he was served with disciplinary charges, again for misconduct.  (Def.

56.1 St. ¶¶ 43-45.)  Following this incident, a disciplinary hearing was held on August 31, 2009,

pursuant to Plaintiff's collective bargaining agreement ("CBA"), at which Plaintiff was

represented.  (Id. ¶¶ 46-47.)  The conference officer at the hearing determined that Plaintiff had

displayed disruptive behavior and recommended that he be terminated.  (Id. ¶¶ 47-48.)  Under

the CBA, Plaintiff could accept the officer's recommendation, pursue the CBA's disciplinary

process through to arbitration or proceed with a hearing through the Office of Administrative

Trials and Hearings ("OATH"); Plaintiff chose the third option.  (Id. ¶¶ 48-50.)

On January 11, 2011, an OATH hearing was held before Administrative Law

Judge ("ALJ") John B. Spooner.  Plaintiff testified and was represented by private counsel at this

hearing and the ALJ found that, considering the contradictions between Plaintiff's testimony and

that of Defendant Reynolds, Defendant Reynolds was more credible.  (Def. 56.1 St. ¶¶ 50-59.)

The ALJ also found that, in light of Plaintiff's deliberate threats, which were "calculated to

either deter Ms. Reynolds from taking some kind of adverse action against or compel her to

provide him with some benefit, such as a promotion," and Plaintiff's prior disciplinary history,

termination was an appropriate penalty.  (Id. ¶ 61.)  Following the OATH hearing, HHC adopted

the ALJ's report and recommendation and Plaintiff was terminated.  (Id. ¶ 63.)  Plaintiff then

appealed to the Personnel Review Board ("PRB"), which met on August 17, 2011, to hear his

appeal, where Plaintiff was again represented by counsel.  The PRB affirmed the findings of ALJ

including the recommendation that Plaintiff be terminated.  (Def. 56.1 St. ¶¶ 65-67.)


Procedural History

Plaintiff alleges that he filed a complaint of discrimination (the "Intake

Questionnaire") with Congressman Gregory Meeks on August 11, 2009, and that it was received

by the EEOC on August 21, 2009, and assigned Charge No.: 520-2009-04353.  (Pl. 56.1 Counter

St. ¶¶ 146-47.)  According to Plaintiff, on October 29, 2009, the EEOC requested that Plaintiff

complete a formal Charge of Discrimination form.  (Id. ¶ 149.)  He filed the Charge form with

the EEOC on November 20, 2009.  (See Def. 56.1 St. ¶¶ 108-109.)  On August 26, 2011, the

EEOC issued Plaintiff a right to sue letter, notifying him that, after reviewing the case, it had

determined that HHC had legitimate nondiscriminatory reasons for its actions.  (Id. ¶¶ 110-11.)

Plaintiff commenced this action on December 2, 2011.  (Id. ¶ 112.)

In his Complaint, Plaintiff asserts claims for discrimination, hostile work

environment and retaliation under the ADA on the basis of his disability (Count I); on the basis

of his age and national origin under Title VII (Count II);[7] and on the basis of his age under the

ADEA (Count III); a Section 1983 Equal Protection Clause claim alleging discrimination on the

basis of Plaintiff's race and color (Count IV); a further Section 1983 claim alleging that Plaintiff

suffered disparate treatment based on his race, color and disability and that Defendants' behavior

---

[7]     Because Title VII only protects against discrimination on the basis of an "individual's
race, color, religion, sex, or national origin" and not age, the Court addresses
Plaintiff's Title VII claim as one of discrimination based on national origin.   See 42
U.S.C.S. § 2000e-2 (LexisNexis 2012).

rose to a level of policy or custom (Count V); a claim alleging discrimination on the basis of

Plaintiff's race, color, national origin, age and disability in violation of Title VI (Count VIII);[8]

and claims for discrimination and hostile work environment under the NYSHRL (Count VI;

Count VII).


DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered material if "it might

affect the outcome of the suit under the governing law," and an issue of fact is a genuine one

where "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011)

(internal quotation marks and citation omitted). The opposing party bears the burden of

establishing a genuine issue of fact by "citing to particular parts of materials in the record." Fed.

R. Civ. P. 56(c)(1); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). In determining

whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities

and draw all permissible factual inferences in favor of the party against whom summary

judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation

marks and citation omitted). However, "[a] party may not rely on mere speculation or conjecture

---

[8]    Age and disability discrimination claims are not cognizable under Title VI.  See 42
U.S.C.S. § 2000d (2009) ("[n]o person in the United States shall, on the ground of
race, color, or national origin, . . . be subjected to discrimination under any program or
activity receiving Federal financial assistance").  Therefore, the Court construes
Plaintiff to be raising only a claim for discrimination on the basis of his national
origin, race and/or color under Title VI.

as to the true nature of the facts to overcome a motion for summary judgment." Hicks v. Baines,

593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

Timeliness and Administrative Exhaustion of Title VII, ADA and ADEA Claims

"In New York, an employment discrimination claim [under the ADA, ADEA, or

Title VII] is time-barred unless the plaintiff first files an EEOC charge within 300 days of the

alleged discrimination." Kasraie v. Jumeirah Hospitality & Leisure (USA), Inc., No. 12CV8829-

KBF, 2013 WL 5597121, at *3 (S.D.N.Y. Oct. 10, 2013) (holding that a plaintiff's federal Title

VII and ADEA claims were time-barred if the charge had not been timely filed within 300 days

of the alleged discrimination); see also Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 325-

29 (2d Cir. 1999) (for ADA and ADEA claims, the EEOC charge must be brought within 300

days after the alleged discrimination). Defendants argue that Plaintiff's promotion-related

claims are untimely and that he failed to exhaust his administrative remedies with respect to his

hostile work environment claims.

On August 21, 2009, Plaintiff filed his Intake Questionnaire (the "Intake

Questionnaire"), which he submitted through Congressman Meeks' Office, with the EEOC and

on November 20, 2009, he filed his Charge of Discrimination (the "Charge") with the EEOC.

Plaintiff argues that the operative date for timeliness purposes is August 21, 2009, when he

submitted the Intake Questionnaire; Defendants argue that the operative date is November 20,

2009, when the formal Charge was filed. Because such timeliness disputes had arisen with some

frequency in the past, the EEOC modified its Intake Questionnaire in 2008

> to facilitate the determination whether such a questionnaire, in any particular
> case, constitutes a charge. Specifically, 'the EEOC has changed the [Intake
> Questionnaire] to require a claimant to clearly express his or her intent by

> checking one of two boxes, thereby 'forc[ing] claimants to decide whether their
> questionnaire is a request for the agency to take remedial action, such that courts
> can objectively determine whether each questionnaire is a charge of
> discrimination or merely a request for further information.

Brown v. City of New York, No. 11CV2915-PAE, 2013 WL 3789091, at *8 (S.D.N.Y. July 19,

2013) (citing Federal Express Corp. v. Holowecki, 552 U.S. 389, 398-99 (2008); quoting Lugo-

Young v. Courier Network, Inc., No. 10CV3197-RRM, 2012 WL 847381, at *6 (E.D.N.Y. Mar.

13, 2012)).  Checking Box 2 on the current form of the EEOC's Intake Questionnaire, which

authorizes the EEOC "to look into the discrimination" described in the form and describing that

discrimination in detail in the Questionnaire, as the Plaintiff did here, "qualifies as a charge with

the EEOC for timeliness purposes."  Brown, 2013 WL 3789091, at *8-9.  Accordingly, the

appropriate date from which to measure the retrospective 300-day period here is August 21,

2009.  Thus, unless Plaintiff can demonstrate that there is a basis in the record for a finding of a

continuing violation[9] or equitable tolling of the filing period, only his claims based on acts which

occurred between October 25, 2008 and August 21, 2009, or were reasonably related to acts

which occurred within that period, are timely.  See, e.g., McGullam v. Cedar Graphics, 609 F.3d

70, 75-76 (2d Cir. 2010) (recovery for "discrete acts of discrimination or retaliation that occur

outside the statutory time period, even if other acts of discrimination occurred within the

statutory time period," is precluded) (internal quotation marks and citations omitted).  A claim

---

[9]     The Supreme Court has made clear the difference between discrete acts of
discrimination and continuing violations, holding that "[d]iscrete acts, such as
termination, failure to promote, denial of transfer, or refusal to hire are easy to
identify.  Each incident of discrimination and each retaliatory adverse employment
decision constitutes a separate actionable 'unlawful employment practice,'" whereas
ongoing violations like "[h]ostile environment claims are different in kind from
discrete acts.  Their very nature involves repeated conduct."  National R.R.
Passenger Corp. v. Morgan, 536 U.S. 101, 114-15 (2002).

begins to accrue when a plaintiff knew or had reason to know of a discrete act of discrimination. Delaware State College v. Ricks, 449 U.S. 250, 259-262 (1980).

"[C]laims that the discriminatory acts were part of a continuing policy and practice of prohibited discrimination," Valtech v. City of New York, 400 F. App'x 586, 588 (2d Cir. 2010), may support application of the continuing violation doctrine.  However "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation."  Id. at 588-89 (internal quotation marks and citation omitted).  "An allegation of common motivation without some evidence of a discriminatory policy or scheme is insufficient to demonstrate that the violations were part of a continuous act of discrimination."  Abato v. New York City Off-Track Betting Corp., No. 03CV5849-LTS-HBP, 2007 WL 1659197, at *10 (S.D.N.Y. June 7, 2007).

Plaintiff was considered for promotion to the title of "Computer Associate (Operations)" on three occasions – in 2005, 2006, and 2007.  Plaintiff declined to have himself considered for promotion at his last (March 29, 2007), interview, but later requested that his name be restored to the eligible list, and his request was granted by HHC.  Defendants contend that HHC did not conduct another hiring pool before that list expired on January 12, 2009, and Plaintiff has produced no evidence to the contrary.  Therefore, the last date on which the Plaintiff was considered for promotion to the title of Computer Associate Operations was in March 2007 – approximately a year and a half before the commencement of the 300-day filing period. Plaintiff does not allege that he actively sought to be promoted after March 2007.

As noted above, the Supreme Court has held that the failure to promote is properly treated as a discrete act in the context of employment discrimination.  Morgan, 536 U.S. at 114.  Moreover, Plaintiff's claims regarding the failure to promote involved different actors

and different hospitals over a time period of several years.  Plaintiff seeks to demonstrate the existence of a continuing violation by asserting that Defendant Goodridge-Smith's refusal to provide a letter attesting to the need for him to fill a position at Harlem Hospital links all of the denials.  However, he proffers only his own conclusory assertion in that regard and, particularly in light of the fact that he applied to pools in which he was considered by several hospitals, his assertion is insufficient to frame a genuine factual issue as to whether the denials of promotions were the product of an overall discriminatory policy or other continuing violation.

Nor is Plaintiff's assertion that he is entitled to equitable tolling of the filing period availing.  "'Equitable tolling is only appropriate in 'rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising [his] rights."  Glatt v. Fox Searchlight Pictures Inc., No. 11CV6784-WHP, 2013 WL 2495140, at *4 (S.D.N.Y. June 11, 2013) (quoting Zerilli-Edelglass v. N.Y.C. Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003)).  Plaintiff's allegations that he diligently applied for promotions and requested certification, and that he was misled in some unspecified way into believing that he would receive a promotion, are insufficient to demonstrate a proper basis for a finding of extraordinary circumstances warranting equitable tolling of the period in which he was required to file a complaint of discrimination as to each of the denials of promotion.  Therefore, Plaintiff's Title VII, ADA and ADEA claims of failure to promote are untimely.  Plaintiff's Title VII, ADA and ADEA claims based on conduct occurring on or after October 29, 2008, are, however, timely.

Timeliness of Section 1983, Title VI and NYSHRL Claims

Plaintiff's claims under 42 U.S.C. § 1983, Title VI and the NYSHRL are all subject to a three-year statute of limitations.  See, e.g., Mussington v. St. Luke's Hospital Center,

824 F. Supp. 427, 432, n. 4 (S.D.N.Y. 1993), aff'd, 18 F.3d 1034 (1994) ("[i]t is undisputed that

for § 1983 suits, the New York statute of limitations for personal injury actions, three years,

applies . . . inasmuch as [a] Title VI claim is also based on a violation of civil rights, the same

statute of limitations is appropriate for it as well"); Lugo v. City of New York, 518 F. App'x 28,

29, (2d Cir. 2013) ("[t]he statute of limitations for actions under . . the NYSHRL . . . is three

years").  Plaintiff's original complaint was filed on December 2, 2011.  As explained in the

preceding section, Plaintiff has not demonstrated the existence of a continuing violation or any

grounds for equitable tolling as to the denials of his request for promotion or any other allegedly

discriminatory acts.  Plaintiff's Section 1983, Title VI and NYSHRL claims based on events

prior to December 2, 2008, are therefore time-barred.


Administrative Exhaustion

       Non-disability Discrimination Claims

       Administrative exhaustion is "a precondition to bringing a [ADA, ADEA or][10]

Title VII action," Francis v. City of New York, 235 F.3d 763, 768 (2d Cir. 2000) (internal

quotation marks and citation omitted) and, in general, claims that were not presented to the

EEOC "may be pursued in a subsequent federal court action [only] if they are 'reasonably

related' to those that were filed with the agency."  Legnani v. Alitalia Linee Aeree Italiane,

S.P.A., 274 F.3d 683, 686 (2d Cir. 2001) (per curiam) (internal quotation marks and citations

omitted).  Courts consider three categories of claims to be reasonably related: claims based on

conduct that "would fall within the scope of the EEOC investigation which can reasonably be

---

[10]     See, e.g., Lang v. New York City Health and Hospitals Corp., No. 12CV5523-WHP,
2013 WL 4774751, at *3 (S.D.N.Y. Sept. 5, 2013).

expected to grow out of the charge that was made"; claims alleging retaliation arising from the filing of an EEOC charge; and claims alleging "further incidents of discrimination carried out in precisely the same manner as alleged in the EEOC charge."  Williams v. New York City Hous. Auth., 458 F.3d 67, 70 and n. 1 (2d Cir. 2006).  To determine whether claims properly "fall within the scope" of the EEOC investigation, "the focus should be on the factual allegations made in the [EEOC] charge itself," Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003) (internal quotation marks and citation omitted), and "whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.'" Williams, 458 at 70 (internal quotation marks and citation omitted).

Here, Plaintiff's Intake Questionnaire and EEOC Charge only assert claims under the ADA on the basis of his hearing impairment.  Plaintiff checked "disability" as the basis for his claims of employment discrimination and did not indicate his national origin on the Intake Questionnaire, leaving the line blank.  (See Pelle-Beer Decl., Ex. L at 2.)  In his complaint letter to Congressman Gregory Meeks, Plaintiff asserted that he is deaf, that his supervisors "claim that [he] cannot hear and doesn't deserve to be appointed," and that he was retaliated against for complaining.  (Id. at 9-10.)  The email that Plaintiff received from the EEOC indicates that the EEOC also read his Intake Questionnaire as alleging only disability discrimination as the basis for his claims and not discrimination on the basis of his national origin, race, color or age.  (See Pelle-Beer Decl., Ex. V.)  Finally, in his EEOC Charge, Plaintiff alleges only that he was discriminated against due to his disability in violation of the ADA.  (See Pelle-Beer Decl., Ex. X.)  Plaintiff did not check any boxes to indicate that he was discriminated against on any other basis and he did not state anywhere in the Charge his date of birth or his national origin.  (Id., Ex. W.)

Even taking the facts in the light most favorable to Plaintiff and reading his allegations broadly, Plaintiff's race, color, national origin and age discrimination claims are not reasonably related to the disability claims asserted in his Intake Questionnaire and Charge. Plaintiff gave the EEOC no basis for investigating such claims.  Therefore, they are procedurally barred and will be dismissed for failure to exhaust administrative remedies.[11]

### Plaintiff's Hostile Work Environment and Retaliation Claims

Defendants also argue that Plaintiff's hostile work environment and retaliation claims, brought under the ADA, are not reasonably related to the claims alleged in his EEOC Intake Questionnaire and Charge.  However, in his Intake Questionnaire, Plaintiff alleges that he was subject to "constant harassment and discrimination" at work.  (Pelle-Beer Decl., Ex. L at 3.) The EEOC Investigator who reviewed Plaintiff's Questionnaire and supporting materials understood Plaintiff to be asserting a hostile work environment claim (id., Ex. V) and, in his formal Charge, Plaintiff refers to: a "number of occasions" in which he had been subject to derogatory comments; the multiple times over the preceding year and a half that his time sheets had been altered; and the constant bad behavior of his employer.  (Id., Ex. W.)  Plaintiff also explicitly stated that he has been subject to a "hostile working environment."  (Id.)  The Court finds that Plaintiff sufficiently described repeated conduct and a hostile environment in his EEOC complaint so as to exhaust his hostile work environment claim.

For substantially the same reasons, Plaintiff's retaliation claim was also properly exhausted.  Plaintiff specifically stated in his Intake Questionnaire that he had been retaliated against  (see Pelle-Beer Decl., Ex. L at 7) and the EEOC investigator also viewed Plaintiff's

---

[11]     Because disability discrimination claims are not cognizable under Title VII or the ADEA, Plaintiff's claims pursuant to those statutes will be dismissed in their entirety.

Questionnaire as stating a retaliation claim (id., Ex. V).  The EEOC was reasonably on notice that Plaintiff was raising hostile work environment and retaliation claims.  Thus, these claims are not procedurally barred.

Merits of Remaining Charges

The Court now turns to the parties' arguments concerning the merits of Plaintiff's timely claims for discrimination based on his hearing disability under the ADA and the NYSHRL; for retaliation under the ADA and the NYSHRL; for hostile work environment based on his disability under the ADA and NYSHRL; his Title VI claim for national origin, race and color discrimination; his Section 1983 claims, brought under the Equal Protection Clause of the Fourteenth Amendment, for race and color discrimination; and his Monell claims against the HHC.[12]

ADA and NYSHRL Discrimination Claims

The ADA and the NYSHRL prohibit an employer from discriminating against a qualified individual on the basis of disability with regards to the "terms, conditions, and privileges of employment."  42 U.S.C.S. § 12112 (LexisNexis 2009); N.Y. Exec. L. § 296.  At the summary judgment stage, "[t]he burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, governs claims of discrimination under the ADA . . . and

---

[12]    In Monell v. Department of Social Services of City of New York, 436 U.S. 658, 694 (1978), the Supreme Court held that local government entities may be sued under 42 U.S.C. § 1983 only when the plaintiff can establish that the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" upon which Plaintiff intends to sue.

NYSHRL."  Ben-Levy v. Bloomberg, L.P., 518 F. App'x 17, 18 (2d Cir. 2013).  The plaintiff

carries the burden of establishing a prima facie case by showing that "(1) [plaintiff's] employer

is subject to the ADA; (2) [plaintiff] was a person with a disability within the meaning of the

ADA; (3) [plaintiff] was otherwise qualified to perform the essential functions of h[is] job, with

or without reasonable accommodations; and (4) either that plaintiff suffered an 'adverse

employment action' because of h[is] disability, . . . or that [his] employer refused to make a

'reasonable accommodation' for [him]."  Noon v. International Business Machines, No.

12CV4544-CM-FM, 2013 WL 6504410, at *5-6 (S.D.N.Y. Dec. 11, 2013) (internal citations

omitted).  To establish that a plaintiff suffered an adverse employment action because of a

disability, the plaintiff must demonstrate that the disability was, at the very least, "a motivating

factor" for the adverse employment action, if not a "but-for" cause for such an action.  See, e.g.,

Parker v. Columbia Pictures Indus., 204 F.3d 326, 336 (2d Cir. 2000) (holding that "the mixed-

motive analysis available in the Title VII context applies equally to cases brought under the

ADA").[13]

---

[13]     But see Lyman v. New York Presbyterian Hosp., No. 11CV3889-KPF, 2014 WL
3417394, at *10 (S.D.N.Y. July 14, 2014) (explaining that Parker has been called
into question by the Supreme Court's decision in Gross v. FBL Fin. Servs., Inc., 557
U.S. 167 (2009), which held that which held that, under the ADEA, a plaintiff must
prove that "age was the 'but for' cause of the challenged employer decision.")  The
court in Lyman also noted that, because the ADA and the ADEA contain parallel
language, some courts have extended this holding to the ADA.  See Lyman, 2014
WL 3417394, at *10.  The court further stated that certain courts in this Circuit
"have preferred to treat Parker as binding absent a conclusive pronouncement by the
Second Circuit or the Supreme Court, and have continued to apply mixed-motives
analysis under the ADA."  Id.  Because Plaintiff's claims fail under either the "but-
for" or the "motivating factor" test, the distinction does not matter for the purposes
of deciding this motion.

It is undisputed that Plaintiff is a person with a disability under the ADA and that HHC is an employer covered by the ADA with notice of his disability.  It is also undisputed that Plaintiff was qualified to perform the essential functions of his job with a reasonable accommodation, which HHC had provided.  Plaintiff has asserted timely claims that he was subject to adverse actions when he was suspended on February 17, 2009 and again when he was terminated on August 5, 2009.  In support of his claim that his suspension and termination were motivated by discriminatory animus against him, Plaintiff only offers one example of a comment that his direct supervisor, Defendant Reynolds, allegedly made to him – namely, that "Defendant Goodridge said she would not promote him because he could not hear."  (Pl. 56.1 Counter St. ¶ 44.)  However, neither Defendant Reynolds nor Defendant Goodridge-Smith made the decisions to suspend or terminate Plaintiff; the Harlem Hospital Office of Labor Relations did so following investigations into his behavior.  Moreover, Defendant Reynolds' alleged comment was made nearly three years before Plaintiff's February 2009 suspension.  Beyond this comment, Plaintiff offers only conclusory allegations of discriminatory animus and criticisms of the investigatory findings that preceded his suspension and terminations, all of which are insufficient to frame a genuine disputed factual issue as to the reasons for his suspension and termination.  Cf. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) ("a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."); see also Jimoh v. Ernst & Young, 908 F. Supp. 220, 226 (S.D.N.Y. 1995) ("[a]s a matter of law, an employee's disagreement with an employer's business decision is insufficient to prove discriminatory conduct.") (citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir.

1988)).   Accordingly, Plaintiff has not made the requisite <u>prima</u> <u>facie</u> showing of a nexus between adverse employment actions and disability-based discrimination.

Even if Plaintiff were assumed to have made out a <u>prima</u> <u>facie</u> case of disability discrimination, Defendants have offered a legitimate, non-discriminatory reason for the employment actions – namely, Plaintiff's threats to Defendant Reynolds.  "Upon the defendant's articulation of . . . a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the <u>prima</u> <u>facie</u> case drops from the picture, and the burden shifts back to the plaintiff to come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination."  <u>Ben-Levy</u>, 518 F. App'x at 19 (internal quotation marks and citations omitted).  Defendant Reynolds reported that she had been threatened by the Plaintiff to the Hospital's police, who investigated the two incidents.  The police, the OATH ALJ and then the PRB all determined that the evidence supported Defendant Reynold's allegations.  Accordingly, Defendants have offered a legitimate nondiscriminatory reason for the disciplinary actions taken against the Plaintiff in the form of his suspension and later termination.  <u>See</u> <u>Matima v. Celli</u>, 228 F.3d 68, 79 (2d Cir. 2000) ("[a]n employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise"); <u>see</u> <u>also</u> <u>Collins v.</u> <u>NYC Transit Auth.</u>, 305 F.3d 113, 119 (2d Cir. 2002) ("[w]here an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive").  Even viewing the facts in the light most favorable to Plaintiff, no

rational trier of fact could determine on the record before the Court that Plaintiff's suspension and termination were the product of the Defendants' discriminatory animus against the Plaintiff. Therefore, the Court grants Defendants' motion for summary judgment as to Plaintiff's discrimination claims under the ADA and NYSHRL.

ADA and NYSHRL Retaliation Claim

"The anti-retaliation provisions in . . . the ADA, and the NYSHRL . . . contain nearly identical language and are governed by the same burden-shifting analysis." See Wesley-Dickson v. Warwick Valley Cent. School Dist., No. 10CV2428-JGK, 2013 WL 5338516, at *17 (S.D.N.Y. Sept. 24, 2013) (internal citation omitted). To establish a prima facie case of retaliation under the ADA and NYSHRL, a plaintiff must proffer evidence of: (1) participation in a protected activity; (2) knowledge by plaintiff's employer of the protected activity; (3) that plaintiff suffered a "materially adverse" action; and (4) that there is a causal connection between the protected activity and the materially adverse action. Schiano v. Quality Payroll Sys., 445 F.3d 597, 608 (2d Cir. 2006). For claims of retaliation, the Supreme Court has set forth a broader definition of "adverse employment action" than the one used for discrimination claims, see, e.g., Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 207 (2d Cir. 2006) (citing Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 69 (2006)). Although this definition was developed in the context of Title VII retaliation claims, the Second Circuit has also applied it in evaluating ADA retaliation claims, see, e.g., Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 90 (2d Cir. 2010). For the purposes of establishing a prima facie case of retaliation, an employer's action is "materially adverse" if it is "harmful to the point that [it] could well dissuade a reasonable worker" from engaging in an ADA-protected activity. Hicks v.

Baines, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks and citation omitted).  If the

plaintiff proffers a  prima facie  case, defendants have the burden of presenting a legitimate, non-

retaliatory reason for the adverse action(s), and the burden shifts to the plaintiff to show that the

reason was a pretext for discriminatory retaliation.  See Cosgrove v. Sears, Roebuck & Co., 9

F.3d 1033, 1039 (2d Cir. 1993); Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990).

Here, Plaintiff alleges that he reported charges of discrimination to his union in

2006 or early 2007, but he also testified that his union never communicated his alleged charges

to anyone at HHC.  (See Def 56.1 ¶ 107.)  Plaintiff further alleges that he had complained to

Omowale informally before the 2007 hiring pool about Defendant Goodridge-Smith, but that he

did not hear anything further from Omowale.  (Pl. 56.1 Counter St. ¶¶ 59-62.)  These purported

complaints were made at least two years before his first suspension.  In 2008, Plaintiff alleges,

he made a verbal complaint of discriminatory treatment to Defendant Dr. Palmer's secretary.

(Pl. 56.1 Counter St. ¶¶ 82-83.)  Plaintiff further contends that, after he complained to Defendant

Dr. Palmer, the "Defendants ratcheted up their discriminatory acts against him," he was no

longer permitted to fill out his time sheets and his pay was docked.  (Id. ¶¶ 67, 73-78, 90.)

Plaintiff also had difficulty getting time off to attend his mother's funeral and keeping himself

on direct deposit.  (Id. ¶¶ 103-112.)  After he returned from his suspension, Plaintiff alleges,

Defendant Reynolds rewrote his evaluation to change it from "satisfactory" to "less than

satisfactory" and wrote that plaintiff "bypasses superiors and goes to executive office for CEO

and COO . . . Does not understand the chain of command."  (See Pelle-Beer Dec., Ex. F pp. 168-

70.)  Plaintiff further contends that this evaluation was written on September 13, 2009,

approximately five days after the EEOC sent notice to counsel at HHC that a discriminatory

complaint had been filed with it by the Plaintiff.  The documentary evidence shows, however,

that the "satisfactory" evaluation for the period ending September 2008 was not changed, and that the evaluation in question was prepared in March, not September, 2009.  A "below standard" evaluation for the period beginning in September 2008 is dated September 30, 2009. (Schowengerdt Dec., Ex. AA at D0199-D0204; see also supra n.6.)  Finally, according to Plaintiff, after he filed his complaint with the EEOC on August 21, 2009, Defendants refused to negotiate any further with him or his union when they had been doing so previously.

Assuming, arguendo, that the docking of Plaintiff's pay, his difficulty getting time off and direct deposit, his suspension and, ultimately, the circumstances surrounding and leading to his termination can establish the third prong of the prima facie case of retaliation, Plaintiff would still need to show a causal connection between his complaints and any later adverse employment action and that the reasons proffered by the Defendants are not a mere pretext for retaliation.  Plaintiff has not offered any evidence of retaliatory animus on the part of anyone at HHC that would establish the requisite causal connection, and there were a number of different actors involved in the alleged adverse actions taken against the Plaintiff over a lengthy time period.  Moreover, Plaintiff's latest complaint to Dr. Palmer's secretary occurred in September of 2008, while most of the allegedly adverse actions taken against Plaintiff, including his suspension and termination, did not occur until the following year, making it even more difficult to establish causation.  See, e.g.  Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation.  Six months between protected activity and discharge is well beyond the time frame for inferring retaliatory causation.") (citations omitted).  The earliest of the alleged retaliatory adverse actions Plaintiff suffered was the docking of his pay, which supposedly began sometime in 2008, before his complaint to Dr.

Palmer's secretary and more than a year after his complaint to Omowale.  Defendant also offers a legitimate non-retaliatory reason for plaintiff's suspension and termination, namely the fact that Plaintiff threatened Defendant Reynolds, which show that these disciplinary actions were not a pretext for retaliation.  Defendants' alleged refusal to negotiate after the EEOC complaint was filed came in the context of an investigation and the disciplinary proceedings regarding the alleged August 4, 2009, threat to Defendant Reynolds.  Accordingly, even taking the facts in the light most favorable to the Plaintiff, the Court finds that Plaintiff has not framed a genuine dispute of fact as to whether he was retaliated against. Defendants' motion for summary judgment as to Plaintiff's retaliation claims under the ADA and NYSHRL is granted.


### ADA and NYSHRL Hostile Work Environment Claim

In order to state a claim for hostile work environment under the ADA,[14] the plaintiff must show: (1) that the "workplace was permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." Tanvir v. New York City Health & Hospitals Corp., 480 F. App'x 620, 622 (2d. Cir. 2012) (internal quotation marks and citation omitted).  Although there is no "magic threshold" for the number of harassing incidents that is required to establish a hostile work environment, see Sclafani v. PC Richard & Son, 668 F. Supp. 2d 423, 430 (E.D.N.Y. 2009), a plaintiff's workplace must have been permeated with intimidation if the conduct complained of is insufficiently severe.  See id.  Ridicule and insult alone, as minor incidents, will not be sufficient, and the offending incidents must be sufficiently

---

[14]     Because hostile work environment claims under the NYSHRL are governed by the same standards as claims under the ADA and Title VII, the Court considers the two together.  See, e.g. Leopold v. Baccarat, Inc., 174 F.3d 261, 264 n. 1 (2d Cir.1999).

continued and concerted so as to be considered pervasive.  See <u>Kassner v. 2d Ave Delicatesssen,</u>

<u>Inc.</u>, 496 F.3d 229, 240-41 (2d Cir. 2007).  Moreover, a plaintiff's subjective belief that his

workplace was permeated by hostility is insufficient.   See <u>Harris v. Forklift Systems, Inc.</u>, 510

U.S. 17, 21 (1993) (the environment must be objectively as well as subjectively hostile).

Whether a reasonable person would find a work environment to be hostile requires an

assessment of the totality of the circumstances, including considerations such as: "(1) the

frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically

threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct

unreasonably interferes with the employee's work performance."  <u>Brennan v. Metropolitan</u>

<u>Opera Ass'n</u>, 192 F.3d 310, 319 (2d Cir. 1999).

              Here, Plaintiff alleges that, by the end of 2008, he could not longer fill out his

time sheets and began to notice that he was being paid less.  He was not initially allowed to

travel abroad to his mother's funeral, although eventually he was permitted to go.  Plaintiff also

alleges that on three instances Defendant Reynolds called him to speak with her in the presence

of a fellow employee, which embarrassed him, and that he was told by another employee that

Reynolds was attempting to get him fired.  Finally, Plaintiff contends that, in 2009, he was not

trained on a new computer system.  The Court finds these assertions to be no more than vague

allegations of isolated incidents.  Although Plaintiff may subjectively have felt that he was

experiencing a hostile work environment, the actions he alleges were taken are not sufficiently

severe or pervasive to form a hostile work environment claim under the ADA or the NYSHRL.

See <u>Hill v. Rayboy-Brauestein</u>, 467 F. Supp. 2d 336, 351, 359-61 (S.D.N.Y. 2006) (" . . .

insufficient training; . . . requests for documentation before granting vacation; . . . excessive

scrutiny and review" are not materially adverse employment actions for the purposes of a

discrimination or hostile work environment claim); see also Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) ("[a]s a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive") (internal quotation marks and citation omitted).  Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's hostile work environment claims under the ADA and NYSHRL.

### Title VI, 42 U.S.C. §§ 2000d et seq. Claim

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C.S. § 2000d (LexisNexis 2006).  To state a claim for a violation of Title VI, "a plaintiff must show, through specific factual allegations . . ., that (1) the defendant discriminated on a prohibited basis; (2) the discrimination was intentional; and (3) the discrimination was a substantial or motivating factor for the defendant's action."  HB v. Monroe Woodbury Cent. Sch. Dist., No. 11 Civ. 5881, No. 11CV5881-CS, 2012 WL 4477552, at *14 (S.D.N.Y. Sept. 27, 2012) (internal quotation marks and citations omitted).  Here, aside from Plaintiff's own conclusory allegations, there is no evidence that anyone discriminated against the Plaintiff on the basis of his race, color or national origin.  Moreover, "for a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing employment."  Ass'n Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 276 (2d Cir. 1981) (emphasis added).  A plaintiff must allege a "logical nexus" between the federally funded program and the employment discrimination suffered.  Commodari v. Long Isl. Univ., 89 F. Supp. 2d 353, 378 (E.D.N.Y. 2000).  In this case,

Plaintiff does not proffer evidence of the purpose of the federal funding and fails to allege any nexus between the federal funds and the employment discrimination that he allegedly suffered. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's Title VI claim.

Section 1983 Fourteenth Amendment Equal Protection Claim

Plaintiff also asserts a claim under the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, for a violation of his equal protection rights on the basis of his race and color.  (Amended Compl. ¶¶ 175-85.)[15]  Employment discrimination claims brought by public employees under the Equal Protection Clause are analyzed under the McDonnell Douglas framework described above.  See Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010).  Here, the bulk of Plaintiff's equal protection claims relate to failure to promote him, which occurred outside of the three-year statute of limitations for Section 1983 claims.  Even if Plaintiff could establish that he was subject to other adverse action giving rise to an inference of discriminatory intent, Plaintiff has not identified any similarly situated individuals not sharing Plaintiff's purported characteristics who were given preferential treatment.  See, e.g., McGuinness v. Lincoln Hall, 263 F.3d 49, 53-55 (2d Cir. 2011) (to establish a claim under the equal protection clause, a plaintiff must show that other employees who were similarly situated in all material respects were given preferential treatment).  The Court concludes that no reasonable jury could find that Plaintiff has established an Equal

---

[15]   In his Amended Complaint, Plaintiff additionally mentions that his due process rights were violated and that the Defendants conspired against him, but these are only conclusory allegations and are not supported by any factual allegations.  Moreover, Plaintiff's opposition papers only offer arguments in support of an equal protection claim.  Thus, if Plaintiff intended to raise due process or conspiracy claims, the Court deems them abandoned.

Protection Clause violation on the part of the Defendants, and therefore grants Defendants'

motion for summary judgment on this claim.

### Section 1983 Monell Claims

To establish municipal liability under Monell,[16] a plaintiff must allege (1) the

existence of a municipal policy or custom, and (2) a causal connection between the policy and

the alleged civil rights deprivation.  Jones v. Westchester County Dept. of Corrections, 557 F.

Supp. 2d 408, 416-17 (S.D.N.Y. 2008).  However, "[u]nless a plaintiff shows that he has been

the victim of a federal law tort committed by persons for whose conduct the municipality can be

responsible, there is no basis for holding the municipality liable[;] Monell does not create a

stand-alone cause of action under which a plaintiff may sue over a governmental policy,

regardless of whether he suffered the infliction of a tort resulting from the policy."  Askins v.

Doe No. 1, 727 F.3d 248, 253 (2d Cir. 2013).  If a plaintiff fails to allege plausibly that

municipal employees violated his or her constitutional rights, the plaintiff's Monell claim

"necessarily fails as well" as against the municipal entity.  Kajoshaj v. New York City Dep't of

Educ., 543 F. App'x 11, 16-17 (2d Cir. 2013).

Here, Plaintiff has not shown that he suffered a tort under federal law, nor has he

provided any evidence in support of the proposition that HHC perpetuated or permitted a pattern

or practice of discrimination against the Plaintiff.  Accordingly, this claim also fails as a matter

of law.

---

[16]     See Rookard v. HHC, 710 F.2d 41, 45 (2d Cir. 1983) (Monell applies to the HHC, as
it is a municipal entity).

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety.

This Memorandum Opinion and Order resolves Docket Entry Number 45.

The Clerk of Court is hereby directed to enter judgment in favor of the Defendants and to close this case.

SO ORDERED.

Dated: New York, New York
       March 25, 2015

    /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge